UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NILSA ENID LABOY,                    )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )    Case No. 16-cv-30081-KAR
                                     )
CAROLYN W. COLVIN,                   )
Acting Commissioner of Social        )
        Security Administration,     )
                                     )
        Defendant.                   )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO
AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 17 & 23)

ROBERTSON, U.S.M.J.

    I.    INTRODUCTION

    On May 24, 2016, plaintiff Nilsa Enid Laboy ("Plaintiff") filed a complaint pursuant to

42 U.S.C. § 405(g) against the Acting Commissioner of the Social Security Administration

("Commissioner"), appealing the denial of her claims for Supplemental Security Income ("SSI")

and Social Security Disability Insurance ("SSDI"). Plaintiff asserts that the Commissioner's

decision denying her such benefits – memorialized in a January 15, 2015 decision by an

administrative law judge ("ALJ") – is in error. Specifically, Plaintiff alleges that the ALJ erred

by: (1) not assessing her history of left facial paralysis and migraine or tension headaches

secondary to myofascial pain and her fibromyalgia syndrome as severe impairments and taking

into account limitations from these impairments when he assessed Plaintiff's residual functional

capacity ("RFC"), (2) not adopting the opinion of a treating mental health care provider on the

ground that it was solicited to support Plaintiff's benefits application, and (3) failing to give the

opinion probative weight in assessing Plaintiff's RFC.  Plaintiff has moved for judgment on the

pleadings requesting that the matter be remanded to the Social Security Administration for

further proceedings (Dkt. No. 17).  The Commissioner has moved for an order affirming her

decision (Dkt. No. 23).  The parties have consented to this court's jurisdiction (Dkt. No. 16).  *See*

28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court orders a remand to

the Commissioner limited to the issue of the ALJ's failure to treat Plaintiff's physical

impairments (migraine or tension headaches, myofascial pain, and fibromyalgia) as severe or to

address limitations from those physical impairments in the RFC.

II.     PROCEDURAL BACKGROUND

Plaintiff applied for SSI and SSDI with filing dates of October 24 and 29, 2008,

respectively, alleging a June 11, 2007 onset of disability due to stress, mood swings, facial

paralysis, and generalized pain (Administrative Record ("A.R.") at 338-51, 345, 383, 386).

Plaintiff's applications were denied initially and on reconsideration (*id.* at 174-177, 179-84).

Plaintiff requested a hearing before an ALJ, and two were held, the first on June 10, 2011, at

which time Plaintiff claimed disability due to depression, migraines, fibromyalgia, auditory and

visual hallucinations, facial paralysis, fibromyalgia, anxiety, and memory problems (*id.* at 84,

86-87, 89, 93-94, 96), and the second on March 23, 2012, to clarify Plaintiff's earnings records

(*id.* at 109).  Following the hearings, on July 24, 2012, the ALJ issued a partially favorable

decision finding that Plaintiff became disabled as of April 1, 2011 (*id.* at 23).  Plaintiff requested

that the Appeals Council review the decision (*id.* at 178).  The Appeals Council granted review,

and, on November 25, 2013, vacated the ALJ's decision, and remanded the case for further

proceedings, including a further hearing (*id.* at 170-72).  The Appeals Council directed the ALJ

to: (1) as necessary, obtain additional evidence concerning Plaintiff's impairments; (2) give

further consideration to whether Plaintiff had engaged in substantial gainful activity since the alleged onset of her disability; and (3) as necessary, give further consideration to Plaintiff's RFC with specific references to evidence of record (*id.* at 171).

The ALJ conducted a further hearing on October 3, 2014, at which he heard evidence about Plaintiff's employment in 2012 to 2013 and additional evidence related to her impairments (*id.* at 118-39). On January 15, 2015, the ALJ issued his decision, finding that Plaintiff had not been under a disability from July 11, 2007 through the date of the decision (*id.* at 19-60). The Appeals Council denied review (*id.* at 1-7), and the ALJ's January 15, 2015 decision became the final decision of the Commissioner. This suit followed.

III. LEGAL STANDARDS

A. Standard for Entitlement to SSI and SSDI

In order to qualify for SSI and SSDI, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.[1] A claimant is disabled for purposes of SSI and SSDI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when she "is not only unable to do h[er] previous work, but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or

---

[1] For SSDI, the claimant also must demonstrate that the disability commenced prior to the expiration of her insured status for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1).

whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B); 42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under each statute.  *See* 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*.  *See also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.  Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id*.  "RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, *Goodermote*, 690

F.2d at 7, including the burden to demonstrate RFC. *Flaherty v. Astrue*, 2013 WL 4784419, at

*9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At

step five, the Commissioner has the burden of showing the existence of other jobs in the national

economy that the claimant can nonetheless perform.  *Goodermote,* 690 F.2d at 7.

        B.  Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. §

1383(c)(3); 42 U.S.C. § 405(g).  Judicial review "is limited to determining whether the ALJ used

the proper legal standards and found facts upon the proper quantum of evidence." *Ward v.

Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law *de

novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence.

*Id*. (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999)).  Substantial evidence exists "'if a

reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to

support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs*., 955 F.2d 765, 769

(1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs*., 647 F.2d 218, 222 (1st

Cir. 1981)).  In applying the substantial evidence standard, the court must be mindful that it is the

province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the

evidence, and draw conclusions from such evidence.  *Id*.  So long as the substantial evidence

standard is met, the ALJ's factual findings are conclusive even if the record "arguably could

support a different conclusion." *Id*. at 770.  That said, the Commissioner may not ignore

evidence, misapply the law, or judge matters entrusted to experts.  *Nguyen*, 172 F.3d at 35.

IV.  THE RECORD

    A.  Evidence Concerning Plaintiff's Mental Health Impairments

        1.  Treatment and Related Records

Plaintiff was admitted to Baystate Medical Center on July 18, 2007 after she stabbed herself in the abdomen following an argument (A.R. at 531-32).  A July 19, 2007 psychiatric consultation did not result in a psychiatric admission (*id*. at 532).  Instead, outpatient mental health care was arranged (*id.*).  A July 20, 2007 intake assessment completed by Carol Proctor of the Mt. Tom Mental Health Center reflects that Plaintiff was mildly distraught, somewhat guarded, and showed no evidence of thought disorder.  She reported that she superficially stabbed herself in the abdomen after a dispute with her boyfriend.  She graduated from Commerce High School and had worked for the last four years in property management (*id.* at 504-05).  She was deemed to be of average or better intelligence.  Speech and presentation were appropriate given her recent crisis situation (*id.* at 505).  She told Ms. Proctor that she wanted her children back and that they were her first priority (id. at 504).  She was diagnosed with an adjustment disorder with anxiety and a depressed mood.  Ms. Proctor noted that Plaintiff was involved in a relationship with serious conflict (*id.* at 507).  Plaintiff returned to Baystate Medical Center on February 9, 2008, for an episode of depression, reporting that she had been crying all week (*id*. at 511).  She was not admitted for treatment, because she asked to go home, indicating that she could keep herself safe (*id.*).

Plaintiff began treating with the Center for Psychology and Family Services on July 30, 2008 (*id*. at 751).  A Diagnostic Evaluation completed on August 12, 2008 indicated that plaintiff had graduated from Commerce High School.  She was seeking treatment because she was always stressed and crying for no reason.  She had five children, including twins recently born

prematurely who had lots of medical problems. The intake worker noted that Plaintiff was neat, her speech was clear and coherent, she was cooperative, alert, oriented to person, place, and time, with a good memory, clear thought content, and logical and organized thought processes. She had no delusions or hallucinations and her judgment was good (*id.* at 752-53). Strengths for treatment included Plaintiff's intelligence, concern for her children, and support from her mother (*id.* at 754). She displayed apparent signs of depression and anxiety: she appeared sad, and her affect was blunted (*id.*).

On November 6, 2008, Plaintiff's mother completed a function report in connection with a benefits application based on Plaintiff's answers to the questions on the form. According to Plaintiff, she stayed in bed all day and cried. She did not sleep at night, had a hard time thinking and just wanted to die. In terms of personal care, she sometimes forgot to put on her underwear, did not care for her hair, and made a mess when she fed herself. She did not go outside because she did not like people looking at her. She saw ghosts at night and talked with them and heard things. She claimed to believe she was President Bush's daughter, and stated that she went to check the mailbox while undressed. She indicated that her conditions affected her ability to lift, squat, bend, stand, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others (*id.* at 677-84).

In October 2008, a staff member at the office of Plaintiff's primary care provider telephoned Wing Hospital in Palmer indicating that Plaintiff was suicidal (*id.* at 573). The hospital called the office back indicating that Plaintiff was not living at the address she had given to her primary care provider and had changed telephone numbers (*id.*). In a November 12, 2008 quarterly report prepared by the Center for Psychology and Family Services, it was noted that Plaintiff was crying less and eating better, but still having trouble sleeping (*id.* at 749). On

February 4, 2009, Plaintiff was noted to be less depressed with fewer mood swings. She was taking her medication regularly, and cooperating with a DSS safety plan to keep her children from witnessing domestic violence (*id.* at 748). In May 2009, Plaintiff was stable, doing well, and DSS was closing its case. Plaintiff was less depressed and moody. She was taking her medications regularly (*id.* at 747). Plaintiff stopped treating at the Center for Psychology and Family Services after DSS closed its case (*id.* at 744).

Plaintiff's next mental health providers were associated with ServiceNet, where she began mental health care treatment in February or March 2011. ServiceNet records show initial diagnoses of major depressive disorder, recurrent and severe, and post-traumatic stress disorder (*id.* at 962). On March 29, 2011, Ali Moshiri, M.D., conducted a psychiatric evaluation. Plaintiff reported longstanding problems with depression, anxiety, anxiety attacks, and auditory and visual hallucinations (*id.* at 871-72). She had been having trouble sleeping. The voices she heard were always present and disturbing. Sometimes in public, she would scream at the voices to go away (*id.* at 872). Dr. Moshiri noted that Plaintiff was unable to give him a reliable medical history. He observed that her speech was normal, but somewhat childlike. She had moderate eye contact and her affect was appropriate and flat. He saw no acute signs of psychosis, but noted that Plaintiff admitted to auditory and visual hallucinations. He concluded that Plaintiff had been very disabled and unable to function at her age level. She was not taking medication because she had not had access to providers. He prescribed Paxil and Risperdal (*id.* at 872). In a progress note from May 2011, Dr. Moshiri noted that Plaintiff continued to have anxiety attacks and to see things, and changed Plaintiff's medications (*id*. at 869-70). In June 2011, Dr. Moshiri again changed her medication, this time in response to a recommendation from her neurologist. He noted that she appeared stable with no acute signs (*id.* at 974).

Through ServiceNet, Plaintiff was also treated by psychotherapy, initially with Licensed Mental Health Counselor Robin Slavin (*id.* at 862). In May 2011, Ms. Slavin noted that Plaintiff's anxiety kept her from contributing to child care and that she was socially isolated. She had strong support from her mother and was consistent in attending counseling (*id*. at 864). She reported auditory and visual hallucinations telling her to hurt herself and others, and self-injurious behaviors *(id.* at 866-67).

On June 4, 2011, Ms. Slavin completed a Mental Impairment Questionnaire ("MIQ") concerning Plaintiff. Dr. Moshiri co-signed the MIQ (*id.* at 897-900). In the MIQ, Ms. Slavin opined that Plaintiff was unable to work due to auditory and visual hallucinations (*id.* at 897). She was prescribed Celaxa, Klonopin, and Ambien (*id.*). On a checklist of signs and symptoms, Ms. Slavin checked that Plaintiff had anhedonia, decreased energy, thoughts of suicide, a flat affect, feelings of guilt or worthlessness, impairment in impulse control, poverty of content of speech, generalized persistent anxiety, mood disturbances, difficulty thinking or concentrating, recurrent recollections of a traumatic experience, psychological dependence, persistent mood disturbance, persistent nonorganic disturbance of vision, speech, or hearing, apprehensive expectation, paranoid thinking, seclusiveness, emotional withdrawal, psychological or behavior abnormalities, persistent irrational fear, intense and unstable interpersonal relationships, disorientation to time and place, perceptual disturbances, hallucinations or delusions, deeply ingrained maladaptive patterns of behavior, illogical thinking, easy distractability, memory impairment, sleep disturbance, oddities of thought, speech, perceptions, or behavior, loss of intellectual ability of 15 IQ points or more, and recurrent severe panic attacks (*id.* at 898). According to Ms. Slavin, Plaintiff suffered from reduced intellectual functioning attributable to a facial stabbing (treatment of which is discussed *infra*).

In assessing Plaintiff's functional limitations attributable to her mental impairments, Ms. Slavin stated that Plaintiff had extreme restrictions in activities of daily living; extreme difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence and pace; and had endured one or two episodes of decompensation during the last year each lasting two weeks or more. She indicated that Plaintiff had a history of one or more years of being unable to function outside of a highly supportive living arrangement, and that even a minimal increase in mental demands or changes in the environment would cause Plaintiff to decompensate. Finally, she indicated that Plaintiff was not oriented to time or date, had severe forgetfulness and disorganization and a lack of living skills, and engaged in violent outbursts (*id.* at 899-900).

In a September 2011 progress note, Dr. Moshiri noted that Plaintiff had previously been treated for attention deficit/hyperactivity disorder, and he added Adderall to her prescribed medications. He reported that Plaintiff appeared stable with no acute signs of depression or anxiety and was going back to school (*id.* at 965). In subsequent progress notes from October 2011 through April 2012, Dr. Moshiri reported that Plaintiff was stable with no acute signs (*id.* at 953, 962, 1054). In June 2012, Dr. Moshiri reported that Plaintiff was doing extremely well, with the improvement being observed by her therapist. She appeared markedly less depressed and anxious (*id.* at 1044). In August and October 2012 and January 2013, Dr. Moshiri noted that she was stable and doing well, very well or better (*id.* at 1040, 1031, 1029). Dr. Moshiri's January 2013 progress note indicated that Plaintiff was alert and oriented, with normal speech, good eye contact, appropriate and varied affect, and intact judgment (*id.* at 1030). In April 2013, Dr. Moshiri indicated that Plaintiff was stable at baseline with no complaints. He noted, however, that her therapist had observed a marked difficulty with her memory and concentration.

Dr. Moshiri supported psychiatric testing (*id.* at 1025-26).  In a July 8, 2013 progress note, Dr. Moshiri recorded that Plaintiff had generally been more stable with continued benefit from her medication.  His impression was that she appeared alert, oriented, and well kempt.  Her speech was normal with good eye contact, her affect was appropriate and constricted at baseline.  Her cognition and judgment were intact (*id*. at 1014-15).  Dr. Mishiri's progress notes from October 2013 through July 2014 were very similar to his July 2013 notes (*id.* at 989, 995, 1004, 1012-13), although the July 2014 note mentioned Plaintiff's on-going migraine headaches (*id.* at 989).

Plaintiff continued counseling sessions with Ms. Slavin through May 2012, at which time Plaintiff reported that her auditory and visual hallucinations had ceased.  Ms. Slavin noted that Plaintiff's fear and anxiety prevented her from participating in classes or other venues to learn skills for employment or increased participation in her children's lives and that she remained socially isolated (*id*. at 1046, 1050). In a Psycho Social Wellbeing Scale, Ms. Slavin rated Plaintiff's cognitive functioning, emotional functioning, coping skills, immediate and extended social networks, recreational activities, independent living/self-care and role functioning as marginal or impaired, meaning she had serious problems or substantial difficulty in these areas. She rated Plaintiff's impulse control as good (*id.* at 1052-53).

In or around October 2012, Plaintiff began counseling with Licensed Mental Health Counselor Krystyne Bargiel.  Ms. Bargiel observed that Plaintiff appeared to have a difficult time with memory, orientation, and organization (*id.* at 1035, 1037-38).  Ms. Bargiel's assessment of Plaintiff's psycho-social well-being did not differ substantially from Ms. Slavin's, although Ms. Bargiel observed some moderate improvement by January 2014 (*id.* at 1001-02, 1005-06, 1016-19, 1027-28).  In April of 2013, Ms. Bargiel observed that Plaintiff continued to have cognitive impairments and that her memory was so severely impaired that a recent history

taken from Plaintiff was unreliable. Plaintiff was referred for psychological testing, the result of which was that her measured IQ was determined to be 47, resulting in diagnoses of mild mental retardation and low intellectual functioning (*id.* at 1003, 1022). By April 2014, Plaintiff's counselor was Licensed Social Worker Michele Skovera, who rated Plaintiff as having impaired cognitive functioning, emotional functioning, and coping skills, an impaired range of recreational activities, an impaired extended social network, and an impaired ability to live independently, and work or function in another role. She rated Plaintiff as having marginal impulse control, and a marginal immediate social network (*id.* at 992-93). She noted some improvement by July 2014 (*id.* at 990-91).

       2.     <u>Consultative Examinations and Disability Investigations Unit</u>

       a.     Teena Guenther, Ph.D.

On October 26, 2007, Teena Guenther, Ph.D. prepared a consultative examination report for the Massachusetts Rehabilitation Commission Disability Determination Services ("DDS"). Dr. Guenther diagnosed Plaintiff with Major Depressive Disorder, recurrent, Moderate to Severe (*id.* at 503). Dr. Guenther observed that Plaintiff presented as pleasant but somewhat guarded and passive. She estimated Plaintiff's intellectual functioning as near the average range and her insight and judgment as fair. Plaintiff appeared to have a reduced ability to tolerate stress and told Dr. Guenther about symptoms that might make it difficult for her to sustain concentration for work tasks and to relate to coworkers or supervisors. Dr. Guenther concluded that the results of her evaluation were consistent with Plaintiff's allegations of disability (*id.* at 501-03).

       b.     Leon Hutt, Ph.D.

On December 23, 2008, Leon Hutt, Ph.D. interviewed Plaintiff and prepared a second consultative examination report for DDS. Plaintiff reported to Dr. Hutt that she had been

educated in special education classes and could hardly read or write and that her history of past employment was virtually non-existent. She said that she essentially did nothing. Her mother took care of her children, shopped, cooked, and cleaned. She did not want to do anything but close herself in her room all day, was frightened to go outside, and claimed to suffer from auditory and visual hallucinations (*id.* at 654-55). Dr. Hutt observed that Plaintiff had difficulty speaking, was fully alert but weakly oriented to time and place (she could not give the date or the address of Dr. Hutt's office), and was coherent but vague. He concluded that her attentional capacity was well below average and her intellectual functioning was in the borderline range. He diagnosed Plaintiff as suffering from chronic schizophrenia, undifferentiated type, and doubted that she could manage a competitive work environment (*id.* at 655-56).

### c. Cooperative Disability Investigations Unit

In or around November 2008, the Worcester DDS office referred Plaintiff's case to the Cooperative Disability Investigations Unit ("CDIU") (*id.* at 660). The CDIU discovered four cars registered in Plaintiff's name (*id.* at 662). The CDIU conducted surveillance for several days near Plaintiff's home before and after December 23, 2008, the date of Plaintiff's consultative examination with Dr. Hutt, and followed Plaintiff to Dr. Hutt's office on December 23, 2008. On January 27, 2009, a CDIU investigator followed one of the vehicles registered to Plaintiff after observing Plaintiff as a passenger in the vehicle. The vehicle drove to a gas station, where the CDIU investigator saw Plaintiff make a cell phone call. Around ten minutes later, a police officer arrived at the gas station, spoke with Plaintiff, then drove up the CDIU surveillance vehicle. After the CDIU investigator identified himself, the police officer told the CDIU investigator that Plaintiff had called the police to report she was being followed. Plaintiff remembered the make, model, and registration of the CDIU vehicle from a previous day.

Plaintiff had also called the police on December 23, 2008 (the date of her consultative examination with Dr. Hutt) to report that she and her brother were being followed. The police officer reported that Plaintiff was alert and oriented each time she spoke with him and had no difficulty recalling information (*id.* at 662-65).

        d.      Celeste N. Derocho, Ph.D.

Celeste N. Derocho, Ph.D., completed a psychiatric review of Plaintiff that covered the period from July 11, 2007 to January 31, 2009 (*id.* at 691). Based on a thorough file review, Dr. Derocho supported the diagnoses of depression not otherwise specified and anxiety disorder not otherwise specified (*id.* at 694, 696, 707). In Dr. Derocho's summary of the contents of the records, she noted major inconsistencies in Plaintiff's presentation at consultative examinations and between consultative examination reports and notes from Plaintiff's primary care provider (*id.* at 703). Based on these inconsistencies, Dr. Derocho deemed that Plaintiff's allegations about her symptoms and functional limitations were not credible (*id.*) She concluded that Plaintiff could manage hygiene and travel, remember simple and detailed instructions, was able to care for her children, and had adequate judgment to respond to workplace hazards (*id.*). She opined that Plaintiff had symptoms of anxiety and depression that were exacerbated at times of conflict in her romantic relationship (*id.*). In terms of functional limitations, Dr. Derocho specified that Plaintiff had mild restrictions in activities of daily living, and moderate difficulties in maintaining social functioning, and concentration, persistence, and pace. She concluded that Plaintiff had experienced one or two episodes of decompensation of extended duration (*id.* at 701).

As part of the report, Dr. Derocho evaluated Plaintiff's capacity to sustain certain mental activities over the course of a normal work day and work week on an ongoing basis. Dr.

Derocho concluded that Plaintiff was not significantly limited in her ability to remember locations and work procedures, understand, remember and carry out simple or detailed instructions, maintain attention and concentration, carry out ordinary routines, make simple work-related decisions, ask simple questions and ask for assistance, accept instruction and respond appropriately to criticism from a supervisor, get along with co-workers, maintain socially appropriate behavior, respond appropriately to changes in the work setting, be aware of hazards and take precautions, travel or use public transportation, and set realistic goals and make independent plans (*id.* at 705-06). Dr. Derocho concluded that Plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted, complete a normal workday and workweek without interruptions based on psychologically based symptoms, perform at a consistent pace without unreasonable rest periods, and interact appropriately with the general public (*id.*).

Dr. Derocho commented that Plaintiff had some variability in mood and anxiety level, particularly in response to conflicts in a romantic relationship but did not have incapacitating symptoms of depression. Noting that questions had been raised about Plaintiff's judgment in connection with a 2007 suicide attempt, Dr. Derocho further noted that the Department of Social Services had determined that she had adequate judgment to function as primary caretaker for her children. Dr. Derocho rejected as lacking corroboration Plaintiff's claims that she suffered from auditory and visual hallucinations (*id.* at 707).

   e.  Douglas Williams, Psy.D.

Dr. Williams conducted a consultative examination of Plaintiff for DDS on January 2, 2010 in connection with an application for benefits. According to Dr. Williams, Plaintiff

presented as severely disorganized in cognitive functioning.  She identified the year as 1984 and the president as President Kennedy, whom, she said, was her father.  She identified a pen as a crayon and a watch as a bracelet and could not spell "house."  Dr. Williams's summary described Plaintiff as someone who was severely disorganized in cognitive functioning with signs of depression and anxiety, and who reported auditory and visual hallucinations.  He concluded that a diagnosis of psychotic disorder was warranted on the basis of significant cognitive impairment, disorganized thinking, thought disorder, and mood disorder (*id.* at 764-69).

      f.    Margaret Stephenson, Ph.D.

On August 31, 2011, Dr. Stephenson conducted an additional consultative examination of Plaintiff for DDS (*id*. at 910-13).  Dr. Stephenson's diagnostic impression was psychotic disorder not otherwise specified.  She reported that Plaintiff did not remember the names or ages of her five children, said she heard voices on a daily basis to which she responded, and saw her dead grandfather.  Plaintiff told Dr. Stephenson that her mother helped her to take showers, combed her hair, and put on her clothing.  She said she did not know how to use a telephone.  She claimed to have been raped as a child by her mother's boyfriend (*id.* at 910-11).

Dr. Stephenson observed that Plaintiff behaved and appeared to be much younger than her stated age.  During Plaintiff's evaluation, she was unable to read a simple sentence, did not know her age, and was not oriented to time, place, or date.  She scored in the severely impaired range as to attention, memory, calculation, reasoning, and judgment scales.  She scored in the average range in language and comprehension, and in the moderately impaired range in a naming scale.  In summary, Dr. Stephenson concluded that Plaintiff presented with auditory and visual hallucinations and paranoid ideation, severe impairments in daily functioning, attention, reasoning, memory, and orientation.  Dr. Stephenson's diagnostic impression was psychotic

disorder not otherwise specified (*id.* at 912).

B. Evidence Relevant to Plaintiff's Physical Impairments

1. Treatment Records

In or around September 2004, Plaintiff was referred by her primary care physician to Michael Sorrell, M.D. for a neurology consultation. The record reflects that, at the time, Plaintiff was working as a personal care attendant ("PCA"). Plaintiff told Dr. Sorrell that she had been having daily frontal headaches for the last three years, with three to four episodes each day lasting 35 to 40 minutes. The headaches reached a severity level of 7/10 on the pain scale. They were not alleviated by over-the-counter medication. Dr. Sorrell's notes reflect that Plaintiff was stabbed underneath her left ear when she was younger. She had a mild residual lower facial weakness on the left side as a result of the stabbing. Plaintiff's mental status was "normal." Dr. Sorrell's assessment was that Plaintiff was suffering from tension type headaches caused by myofascial pain (*id.* at 774-75).

Handwritten (and generally illegible) records, apparently from the office of Fernando Jayma, M.D., Plaintiff's primary care provider, noted migraine headaches as a problem (*id.* at 571, 572, 575, 584).

Plaintiff began treating with Tessa Hadlock, M.D., in or around 2004 for the aftermath of the knife wound to the main trunk of her left facial nerve (*id.* at 783-84). In or around 2009, after less invasive efforts to address Plaintiff's partial facial paralysis were not as successful as Plaintiff had hoped, Dr. Hadlock recommended a series of surgeries for a nerve graft to restore animation to the left side of her face. Dr. Hadlock performed a series of surgeries over some two years, concluding in 2011 (*id.* at 777-80). During an initial evaluation for physical therapy in connection with the surgery, plaintiff's chief complaints were pain and muscle stiffness, an

17

incomplete smile and inability to express emotion, and eye irritability. Plaintiff reported no difficulty with speech or eating, but reported that she dribbled when drinking from a cup (*id.* at 844). In May 2011, Dr. Hadlock diagnosed Plaintiff with facial pain syndrome following the surgery but otherwise deemed the series of surgeries successful (*id.* at 850).

In April 2011, some seven years after Dr. Sorrell initially saw Plaintiff, he resumed treating her. He noted that her headaches continued unabated, and that she had four to five headaches a week reaching a pain level of 9-10 out of 10. Plaintiff took up to 20 Excedrin a week for her headaches, which caused nausea, vomiting, and sound or light sensitivity, and worsened with movement. Pressure on areas of Plaintiff's face and head reproduced all aspects of her headaches. Dr. Sorrell diagnosed migraines caused by myofascial pain. He also diagnosed Plaintiff with medication overuse headaches caused by excessive Excedrin (*id.* at 904-05). In May 2011, Dr. Sorrell wrote to ServiceNet recommending a change in the medication being prescribed by Dr. Moshiri to better address Plaintiff's fibromyalgia and headaches (*id.* at 902). The doctor also referred Plaintiff for physical therapy to address her headaches and neck pain (*id.* at 853). Records from Performance Rehabilitation show that Plaintiff experienced decreased intensity and frequency of her migraines with increased cervical flexibility as a result of a relatively brief physical therapy. It was noted that she would benefit from additional physical therapy (*id.*).

In May 2011, Plaintiff began treatment with Anuja Garg, M.D. as her primary care provider. Plaintiff identified existing diagnoses of chronic pain syndrome, fibromyalgia, and anxiety and depression. On examination, Dr. Garg noted that Plaintiff was alert and oriented times three, and was calm and comfortable with appropriate behavior. Her mood and affect, appearance, speech, and thought processes were all within normal limits (*id*. at 880, 888). She

diagnosed Plaintiff with chronic headaches and neuropathic pain that would benefit from medication that might also help her fibromyalgia (*id*. at 880, 890).

Dr. Garg referred Plaintiff to psychologist Peter Higgins, Ph.D., of Baystate's Behavioral Health Network, for purposes of pain management using biofeedback techniques (*id.* at 976-85). Plaintiff's appointments spanned approximately four months. She reported having migraines three to four times a week that lasted from two to three hours and taking up to six over-the-counter pain relievers (Excedrin) a day (*id.* at 979, 982). When she had headaches, she would lie in the dark and sleep. She reported pain levels ranging from 6 to 10 out of 10 (*id*. at 982). She asked Dr. Higgins what medications would help with extreme migraines (*id.* at 981). While Plaintiff reported that her symptoms were "better," Dr. Higgins ultimately judged that progress towards treatment goals was slight (*id.* at 976).

A June 2011 record from Pain Management Services at Baystate Medical Center confirmed chronic headaches and the need for treatment for persistent neuropathic pain (*id.* at 908-09). Subsequent records from Pain Management Services showed that Plaintiff's medication was changed and that her pain was mildly reduced. It was noted that Plaintiff was able to perform all activities of daily living, including bathing, feeding, dressing, and toileting herself (*id.* at 936, 938). Around this time, Plaintiff reported to her treating psychiatrist, Dr. Moshiri, that she continued to struggle with migraines (*id.* at 974).

In or around October 2011, Plaintiff changed primary care providers because of a move (*id.* at 1079). Records from her new health care providers, associated with Wing Memorial Medical Hospital and Medical Center ("Wing"), dated from October 2011 through August 2014, include the following information about Plaintiff's migraines and chronic pain. Plaintiff continued to suffer from chronic pain and facial paralysis. Wing initially renewed her

prescriptions for pain medication (*id.*). In June 2012, a Wing health care provider assessed chronic pain syndrome, renewed prescriptions for Gabapentin and Percocet, and advised Plaintiff that she could take one Tylenol with the Percocet for additional pain relief (*id.* at 1076-77). In January 2013, Plaintiff scheduled an appointment with Wing to renew her Percocet prescription and to inform her primary providers about the addition of Xanax to her psychiatric medications. The care provider's assessment was chronic pain, and depression, improving. Plaintiff was calm, cooperative, and appropriate with good eye contact. Her appearance and affect were normal, her mood was slightly depressed and there was no impairment of her thought content (*id.* at 1072-73). In March 2013, plaintiff felt much better in terms of her chronic pain, but requested an increase in her pain medication because of a tingling sensation in her face that bothered her. She was again calm and cooperative with good eye contact. Her mood was euthymic, her affect normal, and there was no thought content impairment (*id.* at 1070-71).

In August 2013, Plaintiff reported that she was suffering from migraine headaches more frequently. She was using Excedrin without effect. She continued to have chronic facial pain as well. The care provider prescribed Propranolol for her headaches (*id*. at 1065-66). When Plaintiff returned to Wing in September 2013, she reported that she was no longer suffering from headaches. She referred to Propranolol as a "miracle drug" (*id.* at 1063). In March 2014, however, Plaintiff went to the Wing emergency room for a migraine headache that lasted for four days. She was prescribed Toradol, which relieved her headache. Two days later, when Plaintiff saw a physician's assistant for follow-up to her emergency room visit, the headache had not returned. Plaintiff called Toradol a "wonder drug" (*id.* at 1061). During this visit, Plaintiff was calm, cooperative, and appropriate with good eye contact (*id.* at 1062). Records from Wing concluded with one dated August 1, 2014. Plaintiff had been referred to a new neurologist

because of her migraines.  She was prescribed Percocet as needed, Propranolol, Topomax, and Imitrex.  Her migraines were under better control in that she reported that the headaches had decreased from six to two to three episodes per month.  The care provider's assessment was that her chronic pain syndrome was well controlled, and her migraines were improving.  She was observed to be calm, cooperative, and appropriate during the appointment (*id.* at 1058-59).

## 2. Medical Evaluations and Consultative Examination

So far as the court has been able to determine, the record includes two medical evaluations based on record reviews conducted for DDS.  The first, dated February 12, 2009, prepared by Erik Purins, M.D., noted that Plaintiff had migraines with no indication of complex or neurological deficits (*id.* at 709).  The second, dated November 24, 2009, was prepared by Romany Hakeem Girgis, M.D.  Dr. Girgis agreed with Dr. Purin's assessment and concluded that Plaintiff's migraines and myofascial pain were not severe impairments (*id.* at 763).

On October 6, 2011, neurologist Armand Arillota, M.D., conducted a consultative examination of Plaintiff for DDS.  Dr. Arillota noted that Plaintiff's past medical history indicated migraine headaches dating back eleven to twelve years, for which she was being treated by Dr. Sorrell.  Plaintiff reported headaches that sometimes occurred several times a day, lasted 30-40 minutes, and sometimes reached a point of 7 out of 10 on the pain scale.  According to Dr. Arillota, Plaintiff told him that the headaches were not associated with nausea or vomiting or sensitivity to light or sound.  Plaintiff apparently told Dr. Arillota that she did not graduate from high school and had never been employed.  Dr. Arillota's neurological examination revealed Plaintiff to be alert, oriented, pleasant, cooperative, and placid.  The left side of her face

and her smile were slightly distorted but her speech was clear. Her visual acuity was normal. He noted that she seemed to have a history of anxiety depression syndrome.

Dr. Arillota stated that, in terms of Plaintiff's abilities, he "believe[d]" that Plaintiff could learn to perform tasks that would require sitting and standing for up to four hours at a time, and could "probably" walk for 2-3 hours at a time. In his view, she would not be able to lift anything weighing more than 20 pounds on a regular basis. She seemed able to carry out and remember instructions, and he believed she could respond appropriately to supervision and coworkers (*id.* at 916-18).

### 3. Letter from Former Employer

Plaintiff's earnings record showed income from employment in 2012-13. According to a letter from Home City Housing, her employer during this period, she worked as an office assistant. Her duties consisted of answering telephones, transferring calls, filing paperwork, and assisting managers with their daily work. She started out as a full-time employee in 2012, but she suffered from chronic migraines and depression, and sometimes came to work so sick from her migraines that other colleagues had to help her finish her work because noise bothered her. She also had fibromyalgia that interfered with her ability to sit still or stand for long periods of time. In December 2012, Plaintiff reduced her hours to part-time, thinking that she would be able to cope with a reduced schedule, but she continued to call in sick and come to work late. In April 2013, she resigned from her employment because of her medical condition (*id.* at 378).

### C. Hearing Testimony

### 1. First Hearing

At the first hearing before the ALJ, on June 10, 2011, he heard from Plaintiff and a vocational expert. Plaintiff testified that she completed the ninth grade and never got a GED.

She could read and write in English.  She had worked as a PCA for about three years.  She left this job voluntarily because "her voices" were telling her to hurt the lady, and she was depressed and starting to get a lot of migraines (*id*. at 82-84).  She had also worked part-time as a security guard in 2003 (*id.* at 85).  She had five children (*id.* at 91).

Her myofascial pain was caused by the injury she received when she was stabbed in the face while in the eighth grade.  Surgeries had not corrected the resulting problems.  She told the judge that the injury affected her vision and her ability to breathe, eat, and drink, and that she got migraines almost every day.  When she had a migraine headache, she said, light and noise bothered her.  She got dizzy and vomited.  Nothing helped with the pain.  She would just lie down and try to fall asleep until the headache went away (*id.* at 86-87).  She felt pain from fibromyalgia in her hands, back, shoulder, and neck.  Pain medication did not help (*id.* at 87-88).

On the question of her psychiatric impairments, Plaintiff testified that she had anxiety attacks and was always sad and crying.  She did not want to leave her room.  She was in treatment with a psychiatrist whom she saw for her medication, but the prescribed medications were not helping her.  She was hospitalized for two nights in 2007 when she tried to stab herself in the stomach.  She had not been hospitalized again, but she had called the crisis hotline.  She heard voices and saw people who had died and who talked to her (*id.* at 89-91, 93-94).  She also had problems going out in public.  She got nervous around people as though she did not belong.  The only place she went was to appointments.  In terms of daily living activities, her mother did the cooking, cleaning, and general housework without assistance from her.  She did not drive or go shopping, although she had a driver's license.  She had a hard time concentrating and remembering and had to write things down (*id.* at 94-96).

The ALJ instructed the vocational expert to envision a female, aged 26, with a high

school education and past relevant work as a PCA. The person had a history of major depressive, post-traumatic, and schizophrenic disorders, and a history of facial paralysis. The person would have no exertional limits, but would be limited to simple one-to-two step tasks requiring no more than an occasional need to interact with co-workers and supervisors and no need to interact with the general public (*id.* at 100). The vocational expert testified that such a hypothetical person would not be able to work as a PCA, but could work as a greenhouse laborer, a laborer in a small warehouse or store, or an industrial cleaner, and that such jobs existed in the local and national economy. If the hypothetical person could only perform light work with no more than an occasional need to reach overhead bilaterally, there would be positions locally and nationally as an office cleaner, a price marker, or an inserter of newspaper advertising supplements. Asked to assume the requirements of a sedentary position, the vocational expert identified basic sorting production, basic production inspector, or final assembler. If the person was likely to be late for work, would need to leave before the end of the work day, or would be absent at least three times per month, the vocational expert testified that the individual would be unemployable (*id.* at 101-04).

2. <u>Second Hearing</u>

The second hearing, on March 23, 2012, was held primarily to clarify employment records related to Plaintiff's employment as a PCA through Stavros (*id.* at 109). According to Plaintiff, she worked as a PCA from 2004 through September of 2007. Records that showed her working from September 2008 through August of 2009 were, she claimed, fraudulent (*id.* at 109-10).

3. <u>Third Hearing</u>

During the third hearing, held on October 3, 2014 after the remand by the Appeals Council, Plaintiff explained her resumption of work for Home City Housing in May or June 2012 through April 2013 and the problems she encountered (*id*. at 118, 126). She was answering the telephone, transferring telephone calls, helping managers with paperwork, and sending mail out. Because of migraines and pain in her hands and back, she often went to work late or called out (*id*. at 126). She had made no efforts to resume work after she left Home City Housing (*id*. at 127). Plaintiff testified that she got migraine headaches a couple of times each week. She had been to a neurologist who had prescribed a new medication that worked for a while, but the medication had ceased to be effective (*id*. at 128). Her headaches generally lasted from five to six hours up to one to two days. When she had one, she was bothered by light and noise, and was nauseous. She coped with the migraines by going to bed (*id*. at 128-29). She also had pain from fibromyalgia in her back and hands. She sometimes dropped things because her hands went numb (*id*. at 130-131). Her facial paralysis had not changed. It caused her problems with eating and drinking and she was facing additional surgery (*id*. at 134-35).

In terms of her mental health issues, Plaintiff testified that she continued to see a therapist for the treatment of her depression and anxiety. Although her medications helped, the symptoms of her depression and anxiety remained as they had been in 2011 and 2012. She cried a lot and had trouble getting out of bed, and she continued to suffer from anxiety attacks. Because of the medication, she no longer heard voices, and her sleep had improved (*id*. at 132-34). Most of the time she could do things around the house, but her mother was usually there and helped. She forgot things and needed reminders to take her medication and perform tasks around the house (*id*. at 135-36).

Assuming the same hypothetical levels of functionality, with the additional need for

seizure precautions (i.e., the individual could not work at heights or around moving machinery), the vocational expert testified that the jobs identified by the vocational expert at the first hearing would remain available in the regional and national economy (*id.* at 137-138).

D. The ALJ's Decision

At the first step of the inquiry, the ALJ found that it was possible that Plaintiff had engaged in substantial gainful activity since July 11, 2007, the alleged onset date, but, because he concluded that Plaintiff was not under a disability at any relevant time, the question of substantial gainful employment did not need to be resolved (*id.* at 24-25).

At the second step, the ALJ found that the evidence established that Plaintiff suffered from major depressive disorder, posttraumatic stress disorder, and schizophrenic disorder and that these impairments qualified as severe. He further found that Plaintiff suffered from facial paralysis, myofascial pain, tension or migraine headaches, and fibromyalgia, but, based on Plaintiff's medical records, the consultative examination performed by Dr. Aliotta, the medical evaluations by Drs. Purin and Girgis, and Plaintiff's hearing testimony, he concluded that these impairments, considered singly or in combination, were non-severe (*id.* at 26-32).

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, subpart P, Appendix 1 (*id.* at 32). Having concluded that Plaintiff suffered from severe mental impairments, the ALJ considered whether Plaintiff met the so-called "Paragraph B" criteria. He found that Plaintiff's impairments caused mild restrictions in Plaintiff's daily living activities; moderate restrictions in social functioning; moderate difficulties with regard to maintaining concentration, persistence and pace; and that she had experienced no episodes of decompensation of extended duration (*id.* at 32-33).

Turning, at step four, to Plaintiff's RFC and her ability to perform her past work, the ALJ found, based on a thorough review of the extensive record generated in this case, that she had the residual functional capacity to perform work at all exertional levels. He found that the evidence established, as non-exertional limitations, that Plaintiff would be limited to simple one-to-two step tasks requiring no more than occasional need to interact with co-workers or supervisors and no need to interact with the public (*id.* at 33-50). He concluded that these functional limitations precluded Plaintiff from performing her past relevant work as a PCA (*id.* at 50). On the basis of the testimony from the vocational experts, the ALJ concluded, however, that, considering Plaintiff's age, education, work experience, and RFC, the Commissioner had satisfied the burden of showing that Plaintiff was capable of performing jobs that existed in substantial numbers in the national economy and, therefore, had not been under a disability from July 11, 2007 through the date of the decision (*id.* at 51-52).

V.    DISCUSSION

Plaintiff objects to the ALJ's decision on three grounds. First, the ALJ found in his initial decision that Plaintiff's physical impairments of left facial paralysis, history of tension or migraine headaches, and fibromyalgia syndrome were severe – and, in fact, disabling – impairments (*id.* at 152, 158, 161). In the decision now under review, the ALJ concluded at step two that these impairments, in combination, had no more than a minimal effect on Plaintiff's ability to engage in gainful activity. Plaintiff contends that the administrative record provides no support for the ALJ's radical shift, which ignored substantial evidence of record (Dkt. No. 18 at 10-11). Second, Plaintiff contends that the ALJ improperly rejected the medical opinion of a treating medical source – the MIQ completed by LHMC Robin Slavin on June 4, 2011 and co-signed by Dr. Moshiri – on the grounds that it was solicited; and, third, that he erred by not

according the MIQ "probative weight when assessing Plaintiff's RFC." For the reasons set forth below, the court concludes that the record lacks substantial evidence to support the finding that Plaintiff's headaches, myofascial pain, and fibromyalgia did not rise to the level of a combination of impairments that were severe as defined in 20 C.F.R. § 1520(c). This was not a harmless error. For this reason, remand is required. The ALJ did not err in his assessment of Plaintiff's mental health impairments, which need not be revisited on remand.

A. <u>The Record Lacks Substantial Evidence to Support the ALJ's Step Two Finding that Plaintiff's Headaches, Myofascial Pain, and Fibromyalgia Were Not Severe</u>.

The ALJ initially found that beginning in or around April 1, 2011, Plaintiff's allegations regarding her symptoms and limitations caused by pain were generally credible. In crafting her RFC, he limited her to jobs that would tolerate at least three occurrences per month of arriving late, leaving early, or being absent because of pain (A.R. at 158). On remand, the Appeals Council instructed the ALJ to, as necessary, obtain additional evidence concerning Plaintiff's impairments, including consultative examinations and medical records, and give further consideration to Plaintiff's RFC with appropriate references to record evidence in support of the assessed limitations (*id.* at 171). In the decision now under review, the same ALJ concluded that Plaintiff's well-documented history of migraine or tension headaches, fibromyalgia syndrome, and myofascial pain did not constitute a serious impairment at step two, nor did he include any limitations caused by these conditions in Plaintiff's RFC (*id.* at 27, 33).

Plaintiff's apparent contention that the ALJ was not entitled to revise his opinion about the severity of Plaintiff's physical impairments fails as a matter of law. As the Commissioner points out, "[t]he ALJ's prior decision [granting Plaintiff's] application for benefits for the same period of disability was vacated by the Appeals Council and does not have preclusive effect." *Mendoza v. Colvin*, No. 13-CV-279-SM, 2014 WL 4146808, at *8 (D.N.H. Aug. 19, 2014)

(citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 843 (6th Cir. 1997); *Izzo v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 280, 287 (3d Cir. 2006); *Kerney v. Colvin*, 14 F. Supp. 3d 943, 949-50 (S.D. Ohio 2014)); *see also Castillo-Mejia*, No. Civ.A. 04-11626-PBS, 2005 WL 1106909, at *8 (D. Mass. May 5, 2005) (citing *Torres v. Sec'y of Health & Human Servs.* 845 F.2d 1136, 1138 (1st Cir. 1988)). The Appeals Council remanded the case (in part) on the basis that the ALJ's assessment of Plaintiff's RFC lacked adequate – or adequately identified – support in the record (A.R. at 171). The ALJ's reappraisal of Plaintiff's physical impairments was well within "the scope of the remand." *Castillo-Mejia*, 2005 WL 1106909, at *8.

On the other hand, the Commissioner is in error in contending that substantial evidence in this record supports the ALJ's step two finding in the decision under review (Dkt. No. 24 at 13). "Step two is a *de minimus* screening device of claims for benefits, where 'a finding of "non-severe" is only to be made where medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.'" *Dunn v. Colvin*, Civil Action No. 15-cv-13390, 2016 WL 4435079, at *8 (D. Mass. Aug. 19, 2016) (quoting *McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1124-25 (1st Cir. 1986) (internal quotation marks and citation omitted)). "Thus, a claim may be denied at step two only if the claimant's impairments 'do not have more than a minimal effect on the [claimant's] physical or mental abilities to perform basic work activities.'" *Id.* (quoting *Munoz v. Sec'y of Health & Human Servs.*, 788 F.2d 822, 823 (1st Cir. 1986)) (alteration in original). *See also Burge v. Colvin*, C.A. No. 15-279S, 2016 WL 8138980, at *7 ("As the First Circuit has long held, Step Two is a screening device to eliminate applicants whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled from gainful employment.") (citing *McDonald*, 795 F.2d at 1123; *Campos v. Colvin*,

No. CA 13-216 ML, 2014 WL 2453358, at *11-12 (D.R.I. June 2, 2014)). Great care must be exercised in applying the concept that an impairment, or combination of impairments, is not severe as that term is defined for purposes of an SSI or SSDI application. *See* SSR85-28, 1984 WL 56856, at *4 (1985).

As do most claims that are based on a claimant's allegations of disabling pain, "migraines pose a difficult challenge because the diagnosis is based largely on symptoms reported by a claimant, not objective evidence." *Dunn*, 2016 WL 4435079, at *12. Migraines, alone or in combination with other impairments, have been found to constitute severe or non-severe impairments at step two, depending on the record evidence. *See, e.g., Moon v. Colvin*, 763 F.3d 718, 720-21 (7th Cir. 2014) (ALJ found migraine headaches, in combination with other medical problems, to be severe impairment but denied beenfits; appellate court ruled that the ALJ failed to build a logical bridge between evidence of chronic migraines and denial of benefits); *Andrade v. Colvin*, Civil Action No. 14-12153-JGD, 2015 WL 5749446, at *5-6 (D. Mass. Sept. 30, 2015) (although it was a close question, the record supported the ALJ's conclusion that the claimant's migraines did not significantly limit her ability to work); *Brown v. Astrue*, Civil Action No. 09-40211-FDS, 2011 WL 3421556, at *4(D. Mass. Aug. 3, 2011) (ALJ found that the claimant's migraine headaches and other medical conditions constituted severe impairments; the case was remanded because the ALJ failed to specifically address the claimant's headaches in the RFC); *Carr v. Astrue*, Civ. Action No. 09cv10502-NG, 2010 WL 3895189, at *4 (D. Mass. Sept. 30, 2010) (ALJ determined that migraines were a severe impairment; the case was remanded for lack of adequate medical opinion evidence to support denial of benefits); *Dalis v. Barnhart*, No. Civ.A. 02-10627-DPW, 2003 WL 21488526, at *3 (D. Nass. June 24, 2003) (ALJ found that claimant's degenerative disc disease and headaches constituted a severe impairment).

"In deciding whether migraines constitute a severe impairment, courts look to the frequency of the headaches, whether the claimant was able to work, whether the headache dissipated with treatment, and whether the claimant had to seek urgent care because of ongoing headache symptoms." *Dunn*, 2016 WL 4435079, at *9 (citing *Andrade*, 2015 WL 5749446, at *5-6). *See, e.g., Jorge v. Colvin*, Civil Action No. 14-cv-11179-DPW, 2015 WL 5210519, at *9 (D. Mass. Aug. 17, 2015) (Report and Recommendation) (ALJ did not err in concluding that migraines were not a severe impairment where the medical records did not indicate that plaintiff consistently complained about migraines, she did not have any emergency room visits or hospitalizations for their treatment, and she was not taking any prescribed medication for migraines); *Andrade*, 2015 WL 5749446, at *5-6 (upholding determination that migraines were not a severe impairment where migraines were controlled by treatment and there was no indication of significant limitations of daily activities); *Merola v. Astrue*, C.A. No. 11-536A, 2012 WL 4482364, at *9 (D.R.I Sept. 26, 2012) (ALJ erred in finding migraines non-severe when plaintiff had long documented history of migraines that rendered her unable to perform basic work for several days every month).

Here, as in the *Merola* case, while the evidence of disability is somewhat mixed, the record does not support the ALJ's step two finding that Plaintiff's migraine headaches, in combination with her closely related complaints of myofascial pain and fibromyalgia, were not a severe impairment as that term is defined for purposes of 20 C.F.R. § 1520(c). *See Merola*, 2012 WL 4482364, at *9; *see also Burge*, 2016 WL 8138980, at *7. The ALJ acknowledged that Plaintiff had received various forms of treatment for her migraines and chronic pain, which weighed in her favor, but, he concluded, the impairments were non-severe because the records showed that treatment was "generally successful in controlling those symptoms" (A.R. at 27).

This finding does not stand up to scrutiny.

The medical records amply document that plaintiff suffered for many years from severe headaches – referred to variously as migraine or tension headaches – and myofascial pain, for which she persistently sought medical attention, was prescribed narcotic medications, overused Execedrin, went, at least once, to the emergency room, and which interfered with her ability to work. She was referred by her primary care provider to a neurologist for treatment of her headaches as early as 2004, when she told Dr. Sorrell that she had had daily frontal headaches for the last three years, with three to four episodes each day, which were not alleviated by over-the-counter medication (A.R. at 774-75). Dr. Sorrell's assessment was that Plaintiff's headaches were caused by myofascial pain resulting from the stab wound she received in school. In 2004, Plaintiff also began treating with Dr. Hadlock to address the sequelae of her stabbing injury (*id.* at 784). The handwritten notes of Plaintiff's primary care physician, Dr. Jayma, which cover the next few years, while largely illegible, refer to migraines as one of Plaintiff's medical problems (*id.* at 571, 572, 575, 584). Dr. Jayma's prescription lists are not legible, but appear to have included Percocet (*id.* at 880). Dr. Hadlock's notes document that, among other things, Plaintiff's injuries, the resulting paralysis, and the repeated surgeries for the paralysis left Plaintiff with facial pain syndrome (*id.* at 850). On May 6, 2011, Dr. Hadlock noted that Plaintiff "had a significant narcotic requirement that I would like to see disappear" (*id.*). Plaintiff had prescriptions for Hydrocodone, an opiate pain reliever, and Tramadol, an opiate-like pain reliever used for moderate to severe pain (*id.* at 875, 878). When Dr. Garg took over as primary care provider in or around May 2011, she shared Dr. Hadlock's concern about Plaintiff's reliance on opioids to manage neuropathic pain and chronic headaches (*id.* at 890). Plaintiff resumed treatment with Dr. Sorrell in April 2011. He noted that her headaches continued

unabated, and that she had four to five headaches a week, reaching on a level of 9-10 in severity on the pain scale. Her use of Excedrin was excessive (*id.* at 904-05). Biofeedback techniques for pain management were largely unsuccessful (*id.* at 976). When Plaintiff changed care providers in or around October 2011, she was suffering from chronic pain and taking Gabapentin and Percocet (*id.* at 1079). In 2012, Plaintiff continued to take Gabapentin and Percocet for pain with moderate improvement. She was advised that she could take Tylenol with the Percocet for additional pain relief *(id.* at 1076-77). In August 2013, Plaintiff told a provider at Wing that she was suffering from migraines more frequently and continued to have chronic facial pain as well. In 2013, Propranolol provided temporary relief for her migraines, but in March 2014, a four-day migraine headache sent Plaintiff to the Wing emergency room. She was prescribed Toradol, a medication prescribed for short-term pain relief. The final August 2014 record from Wing showed that Plaintiff had prescriptions for Percocet, Propranolol, Topomax, and Imitrex (a drug that is not preventative but is used to address pain when migraines occur) (*id.* at 1058-59). Plaintiff reported that the migraines were under better control and had decreased from six to two to three episodes per month (*id.*).

"If proof of disability is based on subjective evidence . . . a credibility determination is . . . critical to the decision." *Burge*, 2016 WL 8138980, at *6. An ALJ must "'either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'" *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting *Teiniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983)). Plaintiff's October 3, 2014 testimony about her migraines, which the ALJ noted, and about which he expressed no skepticism, was that when she had headaches – which she had a couple of times a week and which lasted from five to six hours up to a day or more – she retreated to her bedroom, turned off the lights and television, and tried

to put herself to sleep (*id.* at 127-28).  There was nothing about this testimony that was inconsistent with her medical records.[2]  The ALJ relied on Plaintiff's reference to Toradol as a "wonder drug" to support the conclusion that Plaintiff was asymptomatic with regard to headaches (*id.* at 31).  The records show, however, that, as in the past, relief was no more than partial or temporary:  in August, 2014, Plaintiff's headaches had decreased in frequency from six episodes per month to two to three episodes per month.  There is nothing in the record to suggest that those headaches had decreased in intensity.

Moreover, when Plaintiff tried to return to work in 2012-2013, after the initial partial award of benefits, she was unsuccessful.  Home City Housing, her employer during this period, reported that she sometimes came to work so sick from her migraines that noise bothered her and others had to help her finish her work, and frequently called in sick or came to work late (*id.* at 378).  The ALJ credited and relied on this evidence to conclude that Plaintiff's activities of daily living had, "at least at times, been somewhat greater that the claimant has generally reported" (*id.* at 35).  This letter from Home City Housing, on which the ALJ relied, is consistent with Plaintiff's account of functional limitations attributable to her migraines, myofascial pain, and fibromyalgia, and inconsistent with the ALJ's step two finding that these impairments had no more than a minimal effect on Plaintiff's ability to work.  *See Dunn*, 2016 WL 4435079, at *8.

Dr. Alliota's report, on which the ALJ relied (*id.* at 31), assessed whether Plaintiff had functional limitations as a result of nerve damage, but did not address limitations caused by headaches, myofascial pain, or fibromyalgia (*id.* at 916-18).  The DDS medical evaluations are abbreviated and uninformative, and predated much of the evidence relevant to Plaintiff's history

---

[2] The court acknowledges, as discussed *infra*, that the record calls Plaintiff's credibility into question.  As to Plaintiff's headaches and myofascial pain, however, her medical records consistently show her seeking relief from persistent problems.

of headaches, myofascial pain, and fibromyalgia (*id.* at 709, 763). They cannot support the "significant weight" accorded to them by the ALJ (*id.* at 48-49). *See, e.g., Vega-Valentin*, 725 F. Supp. 2d 264, 271-72 (D.P.R. 2010) (reports submitted by non-examining physicians containing short conclusory statements are entitled to little evidentiary weight); *Rosario v. Apfel*, 85 F. Supp. 2d 62, 68 (D. Mass. 2000) (when non-examining physicians only review a partial record, their reports should be afforded minimal, if any, weight). A statement in a medical record indicating that plaintiff was able to perform all of her activities of daily living, including bathing, feeding, dressing, and toileting herself (A.R. at 938), is not inconsistent with other evidence, including Plaintiff's hearing testimony, substantiating chronic debilitating headaches and related pain (*id.* at 35). The ALJ had no expert opinion evidence that took into account all of the evidence in the record concerning Plaintiff's headaches and related pain. "It is well settled that an ALJ cannot base the RFC determination on his own independent judgment of raw medical data beyond the ken of a lay person." *Burge*, 2016 WL 8138980, at *9 (citing *Morey v. Colvin*, C.A. No. 14-433M, 2015 WL 9855873, at *1, 13 (D.R.I. Oct. 5, 2015), adopted, C.A. No. 14-433-M-PSA, 2016 WL 224104 (D.R.I. Jan. 19, 2016)).

An error in describing an impairment as non-severe at step two is generally harmless when, as in this case, "the ALJ found at least one severe impairment and progressed to the next step of the sequential evaluation." *Chabot v. U.S. Soc. Sec. Admin.*, Civil No. 13-cv-126-PB, 2014 WL 2106498, at *9 (D.N.H. May 10, 2014). That rule, however, applies only when the ALJ "'consider[s] limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe."'" *Dias v. Colvin*, 52 F. Supp. 3d 270, 281 (D. Mass. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *5). *See Burge*, 2016 WL 8138980, at *8 (step two error was not harmless even though the ALJ proceed through the remainder of the sequential

analysis when the record lacked substantial evidence supporting the RFC). The second time around, the ALJ did not incorporate any limitations or restrictions related to Plaintiff's headaches, myofascial pain, or fibromyalgia in crafting Plaintiff's RFC (A.R. at 33).

In summary, I find that the ALJ's treatment at step two of Plaintiff's headaches and related myofascial pain and fibromyalgia, including the weight given to the opinions of non-examining, non-treating DDS reviewers who only had access to a partial record, and an RFC that failed to take into account Plaintiff's well-documented and consistent medical history of headaches and related pain, is sufficiently tainted by error to require remand. Whether this will require a medical expert is left to the Commissioner's discretion. *See Burge*, 2016 WL 8138080, at *9; *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.2d 15, 16-17 (1st Cir. 1996).

B. The ALJ Did Not Err in his Treatment of Plaintiff's Mental Health Impairments

The ALJ's findings regarding Plaintiff's mental health impairments stand on a different footing and are supported by substantial evidence in the record. Accordingly, the Commissioner is not required to revisit this issue on remand. Turning to Plaintiff's specific objections, the court rules as follows.

1. The ALJ Did Not Reject the MIQ Because it was Solicited.

Plaintiff complains that the ALJ declined to adopt the opinions in the MIQ because they were solicited to accommodate this application (Dkt. No. 17 at 12, 15). "[I]t is improper to discount a treating source's opinion simply because it was solicited." *Gonzalez v. Astrue,* C.V. No. 11-30201-KPN, 2012 WL 2914453, at *3 (D. Mass. July 5, 2012) (citing *Gonzalez Perez v. Sec. of Health & Human Servs.,* 812 F.2d 747, 749 (1st Cir. 1987)) ("Something more substantive than just the timing and impetus of medical reports obtained after a claim is filed must support an ALJ's decision to discredit them."). Notwithstanding the ALJ's expression of

skepticism about the genesis of the MIQ, his treatment of Ms. Slavin's opinions "can still pass muster if the other reasons given to accord [the] treating [provider's] opinion little weight are adequately supported." *Gonzalez,* 2012 WL 2914453, at *3. The ALJ's reference to the MIQ as solicited was not helpful, but it was not the explanation for his rejection of Ms. Slavin's opinion evidence. As discussed below, his reasons for declining to credit aspects of the MIQ are clearly explained, adequately supported by the record, and free of legal error (A.R. at 44). *See King v. Astrue*, Civil No. 09-337-P-H., 2010 WL 4457447, at *4 (D. Me. Oct. 31, 2010) (ALJ complied with applicable requirements when he expressly referred to treating source opinion evidence, explained the weight afforded to it, and provided discussion adequate to allow reviewer to follow his reasoning).

  2.  The ALJ Did Not Err by Declining to Give "Probative Weight" to the MIQ.

"An ALJ must 'always consider the medical opinions in [the] case record,' 20 C.F.R. §§ 404.1527(b); 416.927(b), and SSA regulations prioritize the opinions of a claimant's treating sources." *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (citing 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1)) (stating that "[g]enerally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you"); *see also Johnson v. Colvin*, 204 F. Supp. 3d 396, 408 (D. Mass. 2016). While "[c]ontrolling weight" is generally given to a treating physician's opinion, *see, e.g., Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004), "[t]he law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians." *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991); *Arruda*, 314 F. Supp. 2d at 72. Controlling weight is generally given to a treating physician's opinion when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the

record.  20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).

> Where controlling weight is not given to a treating source opinion, the ALJ considers an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6); 416.927(c)(2)-(6).  Further, the regulations require adjudicators to explain the weight given to a treating source opinion and the reasons supporting that decision.  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

*Johnson*, 204 F. Supp. 3d at 409.  "'Inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ to resolve.'"  *Id.* (quoting *Roshi v. Comm'r of Soc. Sec.*, Civil Action No. 14-10705-JGD, 2015 WL 6454798, at *6 (D. Mass. Oct. 26, 2015)).

Ms. Slavin did not meet the definition of a "treating source" because she was a licensed mental health care worker and not among the "acceptable medical sources" listed in 20 C.F.R. § 416.913(a).  Rather, she was an "other" medical source.  *See* 20 C.F.R. § 416.913(d).  The opinions of other medical sources are not entitled to controlling weight, although an ALJ is still required to explain his treatment of opinions from other medical sources and cannot ignore such opinions entirely.  *See Johnson*, 204 F. Supp. 3d at 410-11 (citing *Doucette v. Astrue*, 972 F. Supp. 2d 154, 170 (D. Mass. 2013)).  Insofar as Dr. Moshiri cosigned the MIQ, making the opinions in the MIQ those of an acceptable treating source, the ALJ explained that at the point when Dr. Moshiri signed the MIQ, his treating relationship with Plaintiff was very short (A.R. at 44).  *See, e.g., Johnson*, 204 F. Supp. 3d at 409.

More to the point, the ALJ properly relied on inconsistencies in the longitudinal history about the nature and extent of Plaintiff's mental health impairments as a basis for rejecting the opinions in the MIQ (*id.* at 50).  Those inconsistencies were striking, and, as the ALJ noted,

reflected poorly on Plaintiff's credibility with respect to diagnoses that were largely based on

self-reported symptoms.  By way of example, in 2007, when Plaintiff was in mental health

treatment with the Mt. Tom Mental Health Center, she was deemed to be of average or better

than average intelligence (*id.* at 505).  In August 2008, when she was in treatment with the

Center for Psychological and Family Services, her speech was clear and coherent, she was alert

and oriented with a good memory, she denied hallucinations or delusions, her judgment was

good, and her intelligence was deemed to be one of her strengths for treatment (*id.* at 754).  In

contrast, in November 2008, when Plaintiff's mother prepared a function report in connection

with a benefits application, Plaintiff was described as believing she was President Bush's

daughter, suffering from auditory and visual hallucinations, and so impaired that she went

outside to the mailbox without any clothes on (*id.* at 677-84).  In December 2008, when Dr. Hutt

performed a consultative examination, Plaintiff reported that she could barely read or write, had

never worked (she had previously reported a work history), and suffered from auditory and

visual hallucinations.  Dr. Hutt concluded that she had intellectual functioning in the borderline

range, and was "weakly oriented" to time and place (*id.* at 655-56).[3]  There is nothing in the

record to explain this purported precipitous decline in Plaintiff's mental health and intellectual

capacity over a mere matter of months.  Moreover, while Plaintiff presented as mentally

incompetent in her interview with Dr. Hutt, she was coherent and precise when she personally

reported to the police that she and her brother had been followed (by a CDIU investigator) when

she went to Dr. Hutt's office (*id.* at 664-65).  During Plaintiff's treatment with ServiceNet, which

extended from February or March 2011 through July 2014, ServiceNet mental health counselors

---

[3] Plaintiff presented as equally dysfunctional at consultative examinations with Dr. Williams on
January 10, 2010, and Dr. Stephenson, on August 31, 2011 (A.R. at 764-69, 910-13).

deemed Plaintiff to be of borderline intelligence and severely dysfunctional by reason of mental health impairments.  Yet, records from Plaintiff's primary care providers during this period reflect that Plaintiff's appearance, affect, and thought processes were within normal limits (*e.g., id.* at 1071, 1073).

The ALJ is responsible for evaluating a claimant's credibility and reconciling conflicts in the record.  It was well within his purview to reject the opinions in the MIQ as inconsistent with abundant other evidence in this record.  *See, e.g., Johnson*, 204 F. Supp. 3d at 412-13; *Bourinot*, 95 F. Supp. at 181-82 (ALJ's credibility determination properly supported by contradictions between claimant's statements and contents of medical records); *White v. Colvin*, No. CA 14-171 S, 2015 WL 5012614, at *11 & n.17 (D.R.I. Aug. 21, 2015) (substantial evidence supported ALJ's rejection of IQ scores purporting to establish mental retardation when those scores were inconsistent with other record evidence of the claimant's intellectual functioning); *cf.* SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016) (for purposes of evaluating the credibility of a claimant's subjective statements about symptoms and functional limitations, SSR 16-3p directs adjudicators to, among other things, "compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances.")

The ALJ also had a proper basis for his findings related to Plaintiff's mental health impairments.  "[T]here is no question that the ALJ may rely on reports from non-treating physicians when they are more consistent with the record than reports provided by treating physicians [and other care providers]."  *Sokolovskaya v. Colvin*, 187 F. Supp. 3d 324, 334 (D. Mass. 2016) (citing *Berrios-Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991); *DiVirglio v. Apfel*, 21 F. Supp. 2d 76, 80-81 (D. Mass. 1998)).  The ALJ did not

substitute his own lay opinion for opinions offered by Ms. Slavin and Dr. Moshiri. Rather, he gave weight to, and relied upon, the mental RFC prepared by Dr. Derocho, which "reflected a significant level of attention and thought." *Arruda*, 314 F. Supp. 2d at 75. *See Arrington v. Colvin*, 216 F. Supp. 3d 217, 238 (D. Mass. 2016) (ALJ was entitled to give weight to opinion evidence from a non-examining, non-testifying state agency physician and that opinion constituted substantial evidence supporting the ALJ's determination). There was no indication in the record that Plaintiff's mental health status changed for the worse after Dr. Derocho completed her record review. Therefore, Dr. Derocho's report provided substantial evidence to support the ALJ's findings and the RFC. *See Arrington*, 216 F. Supp. 3d at 239.

VI.   CONCLUSION

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision is granted in part and denied in part, and the Commissioner's motion to affirm the decision is denied. Judgment shall enter for the plaintiff, and the Clerk's Office is directed to close the case on the court's docket.

It is so ordered.

Dated: August 24, 2017                                Katherine A. Robertson
                                                      KATHERINE A. ROBERTSON
                                                      UNITED STATES MAGISTRATE JUDGE